```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION
```

| | |
|---|---|
| **MAXXSONICS USA, INC.,** | |
| Plaintiff and Counter-Defendant, | Case No. 10 C 1174 |
| v. | Hon. Harry D. Leinenweber |
| **FENGSHUN PEIYING ELECTRO ACOUSTIC COMPANY, LTD.,** | |
| Defendant and Counter-Plaintiff. | |

### MEMORANDUM OPINION AND ORDER

Before the Court are the Defendant's Motion for Partial Summary Judgment and Motion to Compel. For the reasons stated herein, the Court denies the Motion to Compel and the Motion for Summary Judgment on Count I of Defendant's Counterclaim. The Court grants Defendant's Motion for Summary Judgment on Plaintiff's First Affirmative Defense to the extent that Plaintiff seeks a set-off under purchase orders other than the six at issue in the Counterclaim. The Court denies Summary Judgment on Plaintiff's First Affirmative Defense to the extent that Plaintiff seeks a set-off for defective goods provided under the purchase orders at issue in the Counterclaim.

### I. BACKGROUND

The facts of this case are largely undisputed. Plaintiff Maxxsonics USA, Inc. ("Maxxsonics") is an Illinois corporation that

sells aftermarket audio equipment.  Defendant Fengshun Peiying Electro Acoustic Company, Ltd. ("Fengshun") is a Chinese company that manufactures car amplifiers.  Between roughly 2007 and 2009, Fengshun manufactured amplifiers for Maxxsonics.  According to Plaintiff, a significant number of the amplifiers delivered by Fengshun during that period were defective, and were returned by consumers to retail distributors.  The parties endeavored to resolve the issue, but those efforts broke down, resulting in this litigation.

Maxxsonics evidently paid the invoices for all of amplifiers, save the last six orders.  It is undisputed that Maxxsonics paid $100,000 of the roughly $610,000 due under those invoices.  Neither party appears to dispute that each purchase order constituted a separate contract.  *See* Def.'s Mem. in Support of Summ. J., 1, 2; Pl.'s Resp. at 3, 4.

Fengshun seeks partial summary judgment on Count I of its counterclaim and on Maxxsonics' first affirmative defense. Count I of the counterclaim alleges breach of contract, on the theory that Fengshun performed under the last six purchase orders, but Maxxsonics breached by withholding payment in retaliation for allegedly defective goods that Fengshun had shipped under *previous* purchase orders.  Fengshun also argues that is entitled to summary judgment on Maxxsonics' first affirmative defense of set-off, because a party may not receive a set-off for breaches of unrelated contracts.

Fengshun contends that Maxxsonics' officers admitted that the last six orders of amplifiers were not defective, and thus that Fengshun performed under the purchase order contracts. Fengshun argues that deposition testimony proves that Maxxsonics withheld payment for the final six purchase orders solely due to allegedly defective amplifiers in *previous* shipments. To that end, Fengshun emphasizes the testimony of Alden Stiefel ("Stiefel"), Maxxsonics' President, and Sherri Lynn Sawyer ("Sawyer"), its Vice President of Finance. (The parties spell Stiefel's name differently; the Court adopts the spelling from the deposition transcript.) Because of the extent to which this motion turns on that testimony, the Court takes the usual step of setting it out below. Stiefel testified as follows:

> "Q. Was it your decision not to pay that amount to them on those invoices?
> A. Yes.
> Q. And what was the basis of your decision not to pay the balance due?
> A. We had been trying to get them to repair product for almost 2 years with continued promises that they would take care of it. We were having bank issues. You know the banking situation in the U.S. at the time. We were using the inventory as collateral. The bank said you can no longer use defective product as collateral.
>
> . . .
>
> Q. Did you have any belief at the time you made the decision not to pay Fengshun Peiying the $510,202.34 that was still owed on those contracts, that 100% of the goods supplied pursuant to those [purchase orders] was defective?
> A. No.
>
> . . .

> Q. . . . Do you know whether the product that was in dispute in terms of being defective predated September 19, 2008?
> A. Do I know if the defective product predated those dates?
> Q. Correct.
> A. Yes.
> Q. Okay. It did predate those dates or you know it predated those dates?
> A. I know it predated those dates.

(Stiefel Dep. 41:17 – 43:20.)

Sawyer testified that Maxxsonics stopped paying Fengshun near the end of 2008, and as follows:

> Q. And what was the reason for [discontinuing payments]?
> A. Their inability to provide a solution to defective product problems.
> Q. Was the discontinuance of payments to Fengshun Peiying by Maxxsonics tied specifically to nonconformity of products related to the specific [purchase orders] and the invoices not paid?
> A. I don't believe so.
> Q. So there was a general issue with respect to a repair dispute that caused Maxxsonics to discontinue making payments to Fengshun Peiying?
> A. Yes.
>                . . .
> Q. So we would agree that the non-payment of invoices submitted totaled somewhere in the area of actually about $510,000?
> A. Yes.
> Q. And there was never a calculation made with respect to any claimed nonconformity of goods within those particular [purchase orders] that was the basis of a partial nonpayment of those invoices; is that right?
> A. I'm not aware of any calculation as such.

(Sawyer Dep. 75:1–76:21.) She also testified that Stiefel made the decision to stop paying Fengshun. (*Id.* 75:17– 19.)

Plaintiff has furnished an affidavit from its Vice President of Operations, Marc Sullivan ("Sullivan"), which states that 480 amplifiers from the last six purchase orders were returned as defective, and that Maxxsonics notified Fengshun of 139 such defects by February 26, 2009.

## II. **LEGAL STANDARD**

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence would permit a verdict for the non-movant, and material if it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the movant meets its burden, the non-movant must present facts showing a genuine dispute to avoid summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

Courts do not evaluate credibility or decide facts on summary judgment, and construe all facts in favor of the non-movant. *Liberty Lobby*, 477 U.S. at 249; *Ricci v. DeStefano*, 129 S.Ct. 2658, 2677 (2009). Courts may draw inferences from the evidence, but need not draw every conceivable inference. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci,* 129 S. Ct. at 2677 (citation omitted).

Local Rule 56.1 requires a party opposing summary judgment to serve and file, *inter alia*, a concise response to the movant's statement of material facts, containing (a) numbered responses to each of the movant's material facts, and (b) a statement in the same form setting forth any additional facts which require the denial of summary judgment, with supporting references. This procedure is mandatory. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). However, whether to apply the rules strictly, and deem any improperly controverted statements admitted, lies within the Court's discretion. *Stevo v. Frasor,* 662 F.3d 880, 886-87 (7th Cir. 2011). Even if a movant's statement of material facts is deemed admitted, however, the Court must still evaluate the claims and the record to determine whether summary judgment is appropriate. *RBS Citizens, N.A. v. Compuray Staffing, Inc.*, No. 11 C 2586, 2012 WL 502653 at*2 (N.D. Ill. February 15, 2012).

### III. <u>DISCUSSION</u>

#### A. Motion to Compel

Defendant seeks discovery into Plaintiff's contracts and disputes with another amplifier manufacturer. Having considered the parties' arguments, the Court finds that Plaintiff has demonstrated that the requested discovery would be unduly burdensome in light of the extensive resources it would require and the limited value that any such evidence would have to the case at hand. Accordingly, Defendant's Motion to Compel is denied.

### B. Compliance with Rule 56.1

Defendant correctly points out that Plaintiff did not file a Rule 56.1 response to Defendant's statement of material facts, nor did Maxxsonics file such a statement of its own. Accordingly, it is within this Court's discretion to deem admitted any of Defendant's statements of material fact that are supported by the record. *Tr. Of the Chicago Reg'l Council of Carpenters Pension Fund v. McGreal Const. Co.*, No. 11 C 2810, 2012 WL 280720, at *1 n.1 (N.D. Ill. January 31, 2012).

Although Plaintiff has failed to comply with Rule 56.1, the Court concludes that because the exhibits attached to Plaintiff's response are sufficiently concise and cited in its memorandum, the harsh penalty of disregarding its factual submissions is not warranted here. Accordingly, Defendant's Statements of Material Fact are not deemed admitted unless they are supported by the record and uncontroverted by Plaintiff's evidence.

### C. Fengshun's Counterclaim Count I-Breach of Contract

#### *1. Applicable Law*

Fengshun argues that the United Nations Convention on Contracts for the International Sale of Goods (the "CISG") governs the contracts here, because they arose between companies from the United States and China, which are both CISG signatories. Maxxsonics relies on Illinois law without discussion.

The CISG "sets out substantive provisions of law to govern the formation of international sales contracts and the rights and

obligations of the buyer and seller." *Caterpillar, Inc. v. Usinor Industeel*, 393 F.Supp.2d 659, 673 (N.D. Ill. 2005). The Court agrees that because the United States and China are both CISG signatories, the CISG governs the contracts. *See CNA Int'l Inc. vs. Guangdon Kelon Electronical Holdings*, 05 C 5734, 1 (N.D. Ill. September 3, 2008). However, in a breach of contract claim, relatively little turns on the choice between the CISG and the UCC. The elements of a breach of contract claim are the same either way; a counter-plaintiff must show: "(1) the existence of a valid and enforceable contract containing both definite and certain terms, (2) performance by [counter-] plaintiff, (3) breach by [counter-] defendant and (4) resultant injury to [counter-] plaintiff." *Magellan Intern. Corp. v. Salzgitter Handel GmbH*, 76 F.Supp.2d 919, 924 (N.D. Ill. 1999). Furthermore, in applying the CISG, courts may inform their analysis by looking to parallel UCC provisions. *Dingxi Longhai Dairy, Ltd. v. Becwood Tech.*, 635 F.3d 1106, 1108 (8th Cir. 2011).

### *2. Analysis*

Maxxsonics has effectively conceded three of the four elements of a breach of contract claim, namely: that the six purchase orders created valid and enforceable contracts; that Maxxsonics failed to pay the balance due after receiving the product; and that the resulting damages total roughly $510,202.34. The key issue, however, is whether Fengshun substantially performed its end of the deal.

According to Fengshun, Maxxsonics' officers admitted that it withheld payment because of defective merchandise from *previous* orders, not the six purchase orders at issue in the Counterclaim. Therefore, Fengshun argues, Maxxsonics conceded that the shipments at issue conformed to the contracts. For support, Fengshun points the Sawyer and Stiefel depositions. Unfortunately, several cited pages from Sawyer's deposition were not provided to the Court. Accordingly, the Court must determine whether the record before it shows no genuine issue of material fact regarding Defendant's performance under the last six purchase orders.

The Court finds the identified portions of Stiefel's deposition to be less clear than Defendant suggests. His responses clearly indicate an ongoing dispute, but are not clear either way as to whether payment was withheld (at least in part) due to defective amplifiers in the last six orders. Stiefel was also asked whether 100% of the merchandise in those six orders was defective. This question stands in marked contrast to the more precise version posed to Sawyer the day before: whether the discontinued payments were tied to any nonconforming items in those last shipments. As the movant on summary judgment, Defendant may not choose to ask ambiguous questions and then ask this Court to draw inferences in its favor. For the same reason, the Court will not disregard Plaintiff's responses to interrogatories, which Defendant argues are contradicted by that deposition testimony.

More damaging to Maxxsonics' argument are Sawyer's statements that she did not believe that Maxxsonics' refused pay the balance on the last six orders because of defective merchandise in those orders. If, as Fengshun argues, Sawyer participated in the decision to discontinue payments and holds that belief, Maxxsonics' prospects are dim, indeed. Def.'s Mem. in Support of Summ. J., 7. However, Sawyer testified that Stiefel made that decision, and she did not mention participation on her part. Sawyer Dep. 75:15-19. When contrasted with Maxxsonics' answer to the counterclaim (which denies that the amplifiers conformed to the contracts), Sawyer's belief supports an inference that payment was withheld to gain leverage in the dispute over other amplifiers. However, on summary judgment, this Court must draw all reasonable inferences in favor of the non-movant.

Maxxsonics contends that there is a genuine issue of material fact regarding Fengshun's performance under the contract. It points to Vice President of Operations Marc Sullivan's affidavit, which states that by February 2009, 139 amplifiers from those last six orders were returned as defective, and that customers would eventually return 480 amplifiers from those shipments. Maxxsonics also points to its responses to Defendant's interrogatories, where it identified the number of allegedly defective amplifiers by "stock code" (evidently, amplifier model). However, Maxxsonics apparently failed to answer Defendant's request to identify each returned item by the purchase order under which it was delivered.

Fengshun attacks Sullivan's affidavit as unsupported and pretextual, and deems Maxxsonics' claim that the last shipments contained defective amplifiers a *post hoc* contrivance. Fengshun argues that the affidavit fails to establish that Sullivan has personal knowledge of its contents, because it does not specify how the company tracked the data he offers. However, the affidavit lists Sullivan's role and says that he compiled defective-amplifier data, communicating some of those complaints to Fengshun during the companies' relationship. Though sparse, the affidavit is adequate.

Defendant also claims that the affidavit contradicts Sullivan's deposition testimony, because it purports to tie particular amplifiers to a particular shipment. According to Fengshun, Sullivan conceded in his deposition that Maxxsonics only tracks amplifiers by stock code, not by shipment or any other detailed criteria. In context, it is not as clear as Defendant claims that Sullivan testified that Plaintiff kept no identifying information tying products to a particular shipment. As the Court reads the deposition excerpt, Sullivan was asked how amplifiers are tracked immediately upon receipt, not whether Maxxsonics had any way to identify the purchase order from which a particular product emanated. The Court agrees with Defendant that Plaintiff will need to explain at trial how such tracking occurs, and that Defendant may have ample fodder for cross-examination. However, the Court cannot agree that the deposition so clearly contradicts the

affidavit that the affidavit should be disregarded, or that the deposition testimony eliminates any genuine issue of material fact.

Fengshun also contends that Sullivan conceded that Maxxsonics can only show that its customers returned amplifiers, not that they were actually defective. However, because Fengshun raised this argument for the first time in reply, the argument is waived for purposes of summary judgment. *See Harris v. Warrick County Sheriff's Dept.*, 666 F.3d 444, 448 (7th Cir. 2012).

While the Court appreciates the weight of Defendant's arguments about Plaintiff's ability to tie particular amplifiers to particular shipments, Defendant has the burden of showing an absence of disputed material facts. Furthermore, while it seems likely that the payments were withheld at least *in part* due to previous unsatisfactory shipments, this Court may not weigh evidence on summary judgment. The Court cannot conclude that there is no genuine issue of material fact regarding Fengshun's performance under the final purchase orders. Accordingly, summary judgment on Count I of the counterclaim is denied.

**D. Maxxsonics' Affirmative Defense of Set-Off**

Fengshun also moves for summary judgment on Plaintiff's first affirmative defense: that even if Maxxsonics is liable to Fengshun for breaching the final six purchase orders, Maxxsonics is entitled to a set-off for the defective amplifiers. Fengshun again argues that Maxxsonics employees admitted to withholding payment solely because of allegedly defective amplifiers delivered in previous,

unrelated shipments. Under applicable law, according to Fengshun, set-off is only available for claims arising under the same contract. Plaintiff contends that Fengshun misapprehends its counterclaim, and that its affirmative defense is directed to defective amplifiers in the final six orders. For reasons similar to those above, the motion for summary judgment on Plaintiff's first affirmative defense is denied in part.

### *1. Applicable law*

As noted above, the CISG governs these contracts. Fengshun notes that the CISG has no provision governing set-offs, but essentially argues that this Court should reason by analogy and apply the UCC's set-off rules under the CISG's anticipatory breach provision (Article 71). The Court concludes that Fengshun poses the right standard, but by the wrong route.

Article 50 of the CISG allows a buyer to reduce the price of nonconforming goods, but that remedy is not identical to set-off under the UCC. *See* Michael Bridge, *A Commentary on Articles 1-13 and 78, in THE DRAFT UNCITRAL DIGEST AND BEYOND*, 250 (Franco Ferrari, Harry Fletchner, Ronald A. Brand, Eds.) (2004). Most courts considering the question have determined that set-offs fall outside the CISG's scope. *See, e.g., The Machines Case,* 4C.314/2006 Bundesgericht [Federal Supreme Court]*,* Switzerland (December 20, 2006), *available at http://cisgw3.law.pace.edu/cases/ 061220s1.html*; Stefan Kröll, *Selected Problems Concerning the CISG's Scope of Application*, 25 J. L. & COMMERCE 39, 50-53 (2005-6)

(collecting cases and authority). This is consistent with the position of notable authorities that the general availability of set-off is a procedural issue not specified by the substantive law of the CISG. *See* John O. Honnold, *Uniform Law for International Sales Under the 1980 United Nations Convention*, 341-42 & n.11 (3d. Ed. 1999) (noting that whether a buyer who receives nonconforming goods has a right akin to Art. 50 under the CISG damages provision depends on procedural rules governing set-off and counterclaim). Indeed, the Convention on the Limitation Period in the International Sale of Goods, a procedural counterpart to the CISG, permits set-off if both claims relate to the same contract or to multiple contracts concluded in the course of the same transaction. *See* Art. 25(2), *available at http://treaties.un.org/doc/publication /UNTS/Volume%201511/v1511.pdf.* However, China is not a signatory to the Limitation Convention. *See Status, 1974 Convention on the Limitation Period in the International Sale of Goods*, *http://www.uncitral.org/uncitral/en/uncitral_texts/sale_goods/197 4Convention_status.html*.

Even among those courts which find that set-offs fall within the CISG's scope, most have found the CISG silent on the issue. Applying the CISG's gap-filling procedure, they have then concluded that national law controls whether set-offs are available. *See* Kroll, *Selected Problems, supra*. *See also*, 15 U.S.C. App., Art. 7(2), *available at http://www.uncitral.org/pdf/english/texts/*

*sales/cisg/V10569 97-CISG-e-book.pdf*. Under either approach, most courts seem to apply national law to set-off claims arising from CISG contracts. In terms more familiar to courts in a federalist system, the result is the same whether the CISG (as federal law) has a narrow preemptive scope, thus leaving the Illinois UCC's set-off provision un-preempted, or whether the CISG broadly preempts state law but incorporates state law rules to fill in its gaps.

Ordinarily, this Court would accordingly apply Illinois choice-of-law rules to determine whether Illinois or Chinese law governs the set-off claim. *Forestal Guarani S.A. v. Daros Intern., Inc.*, 613 F.3d 395, 401 (3d Cir. 2010). However, because the parties have applied the Illinois UCC (Defendant by analogy, Plaintiff without comment), this Court will follow suit. *Cf. Checkers Eight Ltd. Partnership v. Hawkins*, 241 F.3d 558, 561 (7th Cir. 2001) (assuming with the parties that Illinois law applies where no party cited any other law).

### *2. Analysis*

Under the Illinois UCC, set-offs are only available for claims arising under the same contract. 810 Ill. Comp. Stat. § 5/2-717 and cmt. 1. Thus, insofar as Maxxsonics seeks a set-off from contracts other than those in the Counterclaim, Fengshun is entitled to summary judgment. However, insofar as Maxxsonics seeks a set-off for faulty amplifiers in the last six orders, that claim turns upon to factual questions that cannot be resolved here: whether those shipments contained defective amplifiers, and extent

to which Maxxsonics was damaged by any such defects.  To that extent, therefore, this Court denies Fengshun's Motion for Summary Judgment on the affirmative defense.

## IV. CONCLUSION

For the reasons stated herein, the Court rules as follows:

1.  Denies Defendant's Motion to Compel;

2.  Denies Defendant's Motion for Summary Judgment on Count I of its Counterclaim;

3.  Grants Defendant's Motion for Summary Judgment on Plaintiff's first affirmative defense, to the extent that Plaintiff seeks a set-off for a breach of any purchase order other than those at stake in the counterclaim; and

4.  Denies Defendant's Motion for Summary Judgment on Plaintiff's first affirmative defense to the extent that Plaintiff seeks a set-off for any allegedly defective amplifiers delivered as part of the final six purchase orders.

**IT IS SO ORDERED.**

	Harry D. Leinenweber, Judge
	United States District Court

**DATE:** 3/21/2012